UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUTO CLUB GROUP INS. CO.,
as Subrogee of Andrea and John Nelson,

    Plaintiff,                                       Case No. 08-15205
                                                 Hon. Lawrence P. Zatkoff
v.

ALL-GLASS AQUARIUM CO., INC.,

    Defendant/Third-Party Plaintiff,

v.

JUDCO MANUFACTURING, INC.,

    Third-Party Defendant.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on May 27, 2010

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Defendant All-Glass Aquarium's ("Defendant") motion for summary judgment [dkt 36].[1] The parties have fully briefed the motion. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R.

---

[1]The Court grants Defendant's motion for leave to file excess pages [dkt 35], which was filed contemporaneously with its motion, and accepts Defendant's 29-page brief. Assumedly out of caution, Defendant also filed a 20-page motion and brief [dkt 37]. As the Court has accepted the 29-page brief, Defendant's 20-page motion and brief for summary judgment [dkt 37] is DENIED as moot.

7.1(e)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted. For the following reasons, Defendant's motion for summary judgment is GRANTED.

## II. BACKGROUND

This action arose out of an August 18, 2006, fire that damaged the home and personal property of John and Andrea Nelson. Plaintiff Auto Club Insurance Co. ("Plaintiff") is the subrogee of the Nelsons. The alleged source of the fire was a 50-gallon aquarium located in the Nelsons' basement, and the alleged cause of the blaze was a faulty light switch inside the aquarium's hood. Third-Party Defendant Judco Manufacturing ("Judco") manufactured the light switch, which Defendant installed during its manufacture of the aquarium hood.

On August 17, 2006, both Nelsons were in the basement of their home. John Nelson went upstairs at approximately 8:00 p.m., and Andrea Nelson stayed downstairs for another hour to finish ironing. John Nelson testified that the aquarium light was not on while he was downstairs. He also testified that the light would not have been turned on since the last time the fish were fed, which occurred on August 14 or August 15. John Nelson also testified that his wife was a smoker, but he did not know whether she had smoked in the basement that evening.[2]

Early the next morning, John Nelson was awoken by the smell of smoke. According to fire-department records, John Nelson called in the fire at 4:32 a.m. on August 18, 2006. Despite the department's efforts, the Nelsons' home and property sustained over $200,000 worth of fire, smoke, and water damage.

Plaintiff hired fire investigator James Maxwell ("Maxwell") to conduct a cause-and-origin

---

[2]Andrea Nelson has since passed away for reasons unrelated to the fire; therefore, her testimony is not available.

investigation. Maxwell twice visited the scene, first on August 22, 2006, and again on October 4, 2006. Maxwell examined the area around the aquarium and collected the surviving debris of the aquarium. He concluded that the fire originated near the top of the aquarium based on burn patterns, but he admitted that an electrical engineer would be required to determine the cause.

Plaintiff also hired Michael McGuire ("McGuire") as an electrical-engineering expert. McGuire did not visit the scene but instead performed a laboratory analysis of the remains collected by Maxwell. McGuire concluded that the only possible cause of the fire was the light switch.

Adam Bainbridge ("Bainbridge") is an electrical engineer retained by Defendant, who analyzed the same remnants as did McGuire on February 28, 2008. Bainbridge identified a piece of the switch from the debris, which contradicted McGuire's conclusion that the fire completely destroyed the switch. Bainbridge found the switch piece to be unharmed, which led him to conclude that the fire started from a different source. Bainbridge could not rule out a brown extension cord that was plugged into the same power strip as were other cords servicing the aquarium, and he also questioned whether an electrical problem in the ceiling might have started the fire.

Plaintiff filed its two-count subrogee complaint in state court alleging that (1) Defendant breached its implied warranty because the aquarium was not reasonably fit for its intended use; and (2) Defendant was negligent in its manufacture of the aquarium. Defendant removed the case to federal court based on diversity of citizenship, and the Court granted Defendant leave to file a third-party complaint against Judco for indemnification. Defendant has now moved for summary judgment on all claims.

### III. LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir. 2001). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To support its motion, the moving party may show "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Although all inferences must be drawn in favor of the nonmoving party, this Court bears no obligation to imagine favorable facts where the nonmoving party has alleged none. The moving party must also set forth facts sufficient to establish its case: "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

Defendant argues that Plaintiff cannot sustain its claims under Michigan products-liability law because it has not proven causation or identified any defect. Defendant also alleges that Plaintiff's claims should be dismissed due to Plaintiff's spoliation of evidence.

Plaintiff contends that its breach-of-implied-warranty and negligence claims are not subject to the same standards as a traditional products-liability claim. Plaintiff also disputes that it was responsible for the spoliation of any evidence.

### A. Michigan Products-Liability Law

"Traditional principles of products liability law recognize three types of defects: manufacturing defects, defects due to faulty design, and defects due to inadequate instructions or

4

warnings." *Fleck v. Titan Tire Corp.*, 177 F. Supp. 2d 605, 613 (E.D. Mich. 2001) (citing Restatement (Third) of Torts § 2 (1998)). "In Michigan, two theories of recovery are recognized in product liability cases; negligence and implied warranty." *Johnson v. Chrysler Corp.*, 74 Mich. App. 532, 535 (1977). The breach-of-warranty claim "tests the fitness of the product and requires that the plaintiff 'prove a defect attributable to the manufacturer and causal connection between that defect and the injury or damage of which he complains.'" *Gregory v. Cincinnati, Inc.*, 450 Mich. 1, 12 (1995) (citing *Piercefield v. Remington Arms Co.*, 375 Mich. 85, 98–99 (1965)). The negligence claim "tests the defendant's conduct instead of the product to determine whether it was reasonable under the circumstances." *Gregory*, 405 Mich. at 12.

"It is well-settled under Michigan law that a prima facie case for products liability requires proof of a causal connection between an established defect and injury." *Skinner v. Square D. Co.*, 445 Mich. 153, 159 (1994). "A plaintiff in a product liability action need not offer evidence which positively excludes every other possible cause." *Mulholland v. DEC Int'l Corp.*, 432 Mich. 395, 415 (1989). Rather, the plaintiff need only "establish[] a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support." *Id.*

## B. Breach of Implied Warranty

Plaintiff's first claim alleges that Defendant breached its implied warranty of fitness in manufacturing a defective aquarium hood.

> When a products liability action is premised on a breach of implied warranty of fitness, the plaintiff must prove that a defect existed at the time the product left the defendant's control, which is normally framed in terms of whether the product was "reasonably fit for its intended, anticipated, or reasonably foreseeable use."

5

*Bouverette v. Westinghouse Elec. Corp.*, 245 Mich. App. 391, 396 (2001) (quoting *Gregory*, 450 Mich. at 34). "Implied warranty claims do not require the plaintiff to specify the type of defect alleged: the mere showing that something went wrong consistent with the existence of a defect is sufficient." *Sundberg v. Keller Ladder*, No. 00-10117, 2001 WL 1397290, at *6 (E.D. Mich. Nov. 8, 2001).

Defendant relies heavily on *Skinner*, and argues that Plaintiff's claims must be dismissed because both the cause of the fire and any defect in the aquarium are speculative. *Skinner* involved a homemade tumbling machine used to shine and smoothen metal parts, on which the decedent had installed a power switch. While using the machine, the decedent was fatally electrocuted. His estate and family filed a products-liability lawsuit against the manufacturer of the power switch. The Michigan Supreme Court rejected the plaintiffs' various hypotheses on how the switch caused the electrocution, noting that '[o]f course, the plaintiffs' offered scenario is a *possibility*. However, so are countless others." *Id*. at 173. Defendant maintains that Plaintiff has not produced sufficient evidence that the fire was caused by the aquarium switch, as opposed to the brown extension cord or another possibility.

Plaintiff argues that it need not identify a specific defect in order to proceed on its claims based on *Kenkel v. Stanley Works*, 256 Mich. App. 548 (2003). In *Kenkel*, the plaintiff became stuck in a malfunctioning automated door at the entrance to a pharmacy, and the court allowed the lawsuit to proceed even though the plaintiff did not identify the exact defect in the door. The court held that "a plaintiff pursuing a claim of breach of implied warranty is not required to identify the precise defect in the product unless there are multiple actors to whom a malfunction could be attributed." *Id*. at 557. The *Kenkel* court distinguished *Skinner* because the plaintiff was able to describe the

6

events prior to and during the malfunction; whereas the *Skinner* plaintiff died immediately afterward and the facts were left to speculation. *Id.* at 498–99.

The cases applying *Kenkel* can be broken into two categories. The first involves situations where the source of the injury (*i.e.*, the causation requirement) has been established by direct testimony or otherwise. In those cases, the plaintiff is not required to identify the specific defect to survive summary judgment. For example, in *Norton v. Auto Club Group Insurance Co.*, No. 02:04-dv-40376, 2009 WL 884129 (E.D. Mich. Mar. 30, 2009), the decedent testified that his toaster caught fire; therefore, a reasonable juror could find that "a toaster that ignited and set fire to a kitchen was defective[.]" *Id.* at *20. Likewise, in *Sundberg*, the court did not require the showing of a specific defect in an allegedly-defective ladder when it was undisputed that the ladder caused the plaintiff's injuries. *Id.* at *7. *See also State Farm Mut. Auto. Ins. Co. v. BMW of N. Am., LLC*, No. 08-12402, 2009 WL 2447612, at *4 (E.D. Mich. Aug. 7, 2009).

However, when causation has not been sufficiently alleged, the identification of the specific defect is required. In *Paquin v. Control Chief Corp.*, No. 2:06-cv-252, 2009 WL 1174457 (W.D. Mich. Apr. 29, 2009), the plaintiff, who was a crane operator, saw and testified to *what* happened—he was struck by the crane's load—but he could not explain *why* it happened. While the plaintiff blamed a remote-control box, the court noted that "[o]ther potential causes, such as a malfunction in the crane or operator error were present." *Id.* at *8. *See also Istvan v. Honda Motor Co., Ltd.*, No. 08-12507, 2010 WL 1254844, at *6 (E.D. Mich. Mar. 25, 2010) (granting summary judgment when multiple factors could have led to motorcycle crash). Such a rule is consistent with *Skinner*, as there was no proof in *Skinner* that the allegedly-defective switch caused the decedent's injuries; therefore, the defect could not be assumed.

7

In this case, causation is greatly disputed, as the parties' experts have identified more than one potential cause of the fire. As the fire started at night, there are no witnesses to testify to the fire's origin. Had Plaintiff been able to prove that the aquarium hood was the source of the fire, whether by eyewitness testimony or otherwise, then it would not be required to identify a specific defect. *See, e.g.*, *Kenkel*, 256 Mich. App. at 557. However, this is not the case here. *See Skinner*, 445 Mich. at 480 ("[T]he mere happening of an unwitnessed mishap neither eliminates nor reduces a plaintiff's duty to effectively demonstrate causation.").

A recent decision of this court provides perhaps the closest factual scenario to the current case and, accordingly, the best guidance. In *Meemic Insurance Co. v. Hewlett-Packard Co.*, No. 09-10155, 2010 WL 1949750 (E.D. Mich. May 13, 2010), the plaintiff's insured returned to find her home on fire. The cause-and-origin experts arrived at competing conclusions; the plaintiff's expert believed that the fire was caused by an AC printer adapter, while the defendant's expert ruled out the adapter. The plaintiff's electrical-engineering expert—who happened to be McGuire, same as Plaintiff's expert here—concluded that the adapter failed for unknown reasons and caused the fire; whereas the defendant's electrical-engineering expert concluded that the adapter could not have caused the blaze.

The *Meemic* court first found that McGuire's opinion, which was based on his visual examination of the adapter, was not sufficiently reliable expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and was otherwise irrelevant. *Id*. at *10–11. The court alternatively held that McGuire's opinion, if admissible, was not sufficient to establish the required causal link between the adapter and the fire. *Id*. at *13. The court similarly found that McGuire's opinions based on "conjecture and speculation" were not sufficient to establish that the

8

adapter was defective. *Id*. at *14.

### 1. Causation

The Court now moves to Plaintiff's claims in this case. The only evidence submitted by Plaintiff in regard to causation is McGuire's opinion, in which he concluded that the light switch was the cause of the fire. This opinion was the result of McGuire's analysis of the materials that Maxwell collected from the Nelson residence following the fire.

As mentioned above, *Meemic* is almost factually identical to the present case. Both cases involved an unwitnessed basement fire that was allegedly caused by a faulty electronic device; the only difference is the type of device. When considering causation, the *Meemic* court found that:

> Plaintiff has not presented substantial evidence of causation. Plaintiff's only evidence to establish a causal connection between the fire and the AC power adapter is the opinion of McGuire. And, as discussed above, McGuire's opinion is based on his subjective belief following a viausal examination of the AC power adapter: it amounts to little more than "mere suppositions." Notwithstanding this Court's determination that McGuire's opinion is inadmissible, his opinion is also insufficient to establish a causal link between an alleged defect in the AC power adapter and the fire. In viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has not sufficiently established causation.

*Id*. at *13 (footnote omitted).

Furthermore, the *Meemic* court came to this conclusion without discussing the viability of other possible causes of the fire. In this case, a brown extension cord was present near the aquarium that neither Maxwell nor Bainbridge could rule out as the cause of the fire. John Nelson, the homeowner, could not remember the purpose for which he was using the brown cord; he could not recall whether it was used for lighting at his bar or to operate a component of the aquarium. Nelson Dep. at 44–48. Bainbridge testified that the brown extension cord displayed arcing 57 inches from

9

the male end that was plugged into the power strip, which was consistent with the cord being used for the aquarium and being present near the top of the aquarium; therefore, he could not eliminate it as a source of the fire. Bainbridge Dep. at 62; 71–72.

McGuire testified as follows in regard to the brown extension cord:

> Q: Did you find any arcing in the brown extension cord?
>
> A: Yes.
>
> Q: Is arcing a potential ignition source for a fire?
>
> A: It can be.
>
> . . .
>
> Q: I'm saying, for the sake of the question, assume that the brown extension cord was located near where the fire started, at the top of the hood.
>
> A: It wouldn't have to be "near." It would have to be exactly where the fire started. The arcing would have to be exactly at that location. That would be the only way that would be feasible, hypothetically.
>
> Q: And what is the basis—Your report says you eliminate the brown extension cord. Well, what do you eliminate it based on?
>
> A: It's not where the fire started. It was on the floor.
>
> Q: That's the reason why you've eliminated it?
>
> A: Yes.

McGuire Dep. at 43–44. That is, McGuire did not further consider the extension cord because he had been informed that the cord was on the floor, rather than near the top of the aquarium.

The Court finds that McGuire's opinions as to causation do not rise above the speculative level and are insufficient to sustain Plaintiff's burden on summary judgment. *See Meemic,* 2010 WL 1949750, at *13; *see also Citizens Ins. Co. of Am. v. Sears Roebuck & Co.*, 203 F. Supp. 2d 837, 852

10

(W.D. Mich. 2002) (granting summary judgment where the plaintiff could not show that it was "more likely than not" that a grill fire occurred in the manner alleged); *Pioneer State Mut. Ins. Co. v. Gen. Motors Corp.*, Nos. 249713, 251382, 2005 WL 995042, at *2 (Mich. Ct. App. Apr. 28, 2005) ("McGuire's conclusion is essentially a 'hunch,' made on the basis of the evidence he found of an electrical failure, combined with the proximity in time to the fire to some significant repair work [the defendant] had completed on the car.").

Moreover, if Defendant's motion were denied, the jury would be "left to decide what caused [the incident] with equally supportable theories." *Istvan*, 2010 WL 1254844, at *6. Michigan's products-liability jurisprudence does not demand such guesswork. Summary judgment is therefore appropriate.

### 2. Defect

As in *Meemic*, McGuire's testimony and opinion regarding the alleged defect is no more compelling. McGuire testified that the fire was caused by the failure of the light switch in the aquarium hood as evidenced by arcing visible on the wiring connected to the switch inside the hood. McGuire posited that the fire was the result of the build-up of a carbon track inside the switch. Similar to *Meemic*, McGuire could not identify a specific manufacturing defect in the product:

> Q: You have no knowledge as to how the switch failed?
>
> A: Well, specifically, I don't know what you mean by that but switch failures—
>
> Q: You said the switch failed. Can you tell us how the switch failed—
>
> A: Well, it generates heat.
>
> Q: —how this particular switch in this particular circumstance, how it failed?

> A: I don't know the specific point, whether it was the switch contact points or the terminals.
>
> Q: Would it be fair to say you don't know specifically how the switch failed?
>
> A: I know how. I know what the failure mode is. I don't know exactly which point.

McGuire Dep. at 67–68.

Likewise, McGuire could not identify how the carbon tracking accumulated in this specific switch:

> Q: All right. How is a switch improperly manufactured that it would lead to carbon tracking?
>
> A: At times, I've seen it where the contacts are misaligned. The contact arms could be bent, so it's not providing proper pressure, or the terminals could not be properly seated.
>
> . . .
>
> Q: Is there anything in your investigation that showed [carbon tracking] could possibly be caused by the way it was assembled into the—
>
> A: Oh, sure. The terminals are going to be connected by the installer, not by the manufacturer of the switch.
>
> Q: And do you know whether or not that was a problem in this case?
>
> A: It very well could be. There's no way to tell at this point.
>
> Q: Your investigation wouldn't show whether or not you had a perfectly manufactured switch that then was improperly installed?
>
> A: Right. That's always a possibility.

McGuire Dep. at 70–71.

Thus, McGuire has only identified arcing on the wiring to the switch, which he hypothesizes

was caused by heat buildup due to carbon tracking. McGuire had no evidence to support his carbon-tracking conclusion because he opined that the entire switch was destroyed in the fire. However, Bainbridge identified a contact piece of the switch that survived the fire, which he concluded was not arced or melted. *See* Bainbridge Dep. at 105–06. McGuire's error could perhaps be explained because his "exemplar" hood was not an exact replica; in fact, the model McGuire used had a *different switch*. *See* McGuire Dep. at 20. Bainbridge testified that he received identical switches during his review. *See* Bainbridge Dep. at 37–40.

In addition, "in the case of a 'manufacturing defect', the product may be evaluated in against the manufacturer's own production standards, as manifested by that manufacturer's other like products." *Prentis v. Yale Mfg. Co.*, 421 Mich. 670, 683 (1984). Even if the Court were to accept McGuire's testimony that the carbon tracking was caused by an improper installation during Defendant's manufacturing process, Plaintiff makes no effort to compare the product at issue to Defendant's manufacturing standards. *See Hammond v. Icon Health & Fitness*, 616 F. Supp. 2d 674, 682 (E.D. Mich. 2009); *Johnson v. Black & Decker (U.S.), Inc.*, 408 F. Supp. 2d 353, 357 (E.D. Mich. 2005).

Considering that Plaintiff has produced no evidence of an alleged manufacturing defect[3] other than McGuire's opinions, and considering that those opinions fail to identify a specific defect in the switch or a fault in the manufacturing process, the Court finds that summary judgment is appropriate for this reason as well.

**C. Negligence**

---

[3]The Court notes that Plaintiff has put forth no argument in support of a design defect or a failure-to-warn theory, which are the other theories upon which to claim a product defect. *See, e.g.*, *Fleck*, 177 F. Supp. 2d at 613.

Plaintiff does not differentiate its negligence claim from its implied-warranty claim. As stated above, the causation factor is lacking and Plaintiff has not sufficiently identified a defect. Moreover, Plaintiff has presented no evidence that Defendant acted unreasonably in its manufacture of the aquarium hood. Defendant is therefore entitled to summary judgment on Plaintiff's negligence claim.

## IV. CONCLUSION

Accordingly, and for the above reasons, IT IS HEREBY ORDERED that Defendant's motion for summary judgment [dkt 36] is GRANTED.

IT IS FURTHER ORDERED that Defendant's motion for leave to file excess pages [dkt 35] is GRANTED and Defendant's second-filed motion for summary judgment [dkt 37] is DENIED as MOOT.

IT IS SO ORDERED.

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: May 27, 2010

CERTIFICATE OF SERVICE

      The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on May 27, 2010.

                                              S/Marie E. Verlinde
                                              Case Manager
                                              (810) 984-3290